

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-21-00168-CV

———————————————

JOSE PIGNANO AND CORA PIGNANO, Appellants

V.

ROBERT L. CASH, M.D., Appellee

On Appeal from the 96th District Court
Tarrant County, Texas
Trial Court No. 096-298964-18

Before Birdwell, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

## I. Introduction

In three issues, Appellants Jose Pignano and his wife, Cora Pignano, challenge a summary judgment granted in favor of Appellee Robert L. Cash, M.D. on their health care liability claim. Dr. Cash's motion for summary judgment asserted that Mr. Pignano's[1] claim was time barred by the two-year statute of limitations contained in Texas Civil Practice and Remedies Code Section 74.251(a) that applies to health care liability claims.

Mr. Pignano alleged that Dr. Cash had failed to timely diagnose a mass in his lungs as cancerous and that the delay in the diagnosis caused the cancer to metastasize, which in turn required a more debilitating treatment and lessened his life expectancy. Dr. Cash predicated his summary-judgment motion on the opinion of Mr. Pignano's expert that Dr. Cash departed from the standard of care on an ascertainable date outside the limitations period. In addition to Mr. Pignano's first issue generally challenging the summary judgment, his second and third issues contend that to grant summary judgment on this basis was error because Dr. Cash provided a course of treatment that extended to a date that saved his claim from being time barred or because the last ascertainable departure from the standard of care occurred on a date that was within the limitations period.

---

[1]As Mr. Pignano was Dr. Cash's patient, we will refer to Mr. Pignano individually throughout the opinion even when referring collectively to both Appellants.

Mr. Pignano's second issue faces a hurdle: if the date that a departure from the standard of care can be ascertained, that date triggers the commencement of the limitations time period. Should there be an ascertainable date, a plaintiff may not rely on the period of the course of treatment as a means of extending the date of the commencement of the statute of limitations. Applying the ascertainable date on which Dr. Cash allegedly departed from the standard of care results in Mr. Pignano's claim being barred by limitations. His third issue fails because we conclude that his expert did not render the opinion that departures from the standard of care occurred within the limitations period. Accordingly, we affirm the trial court's summary judgment.

## II. Factual and procedural background

### A. The chronology of relevant events that applies to the question of whether Mr. Pignano's claims are barred by limitations

Mr. Pignano was referred by his primary-care physician to Dr. Cash, a pulmonologist, for evaluation when a CT scan revealed a mass in Mr. Pignano's lung that was described as "suspicious for malignancy." That referral set in motion a chronology of events that are pivotal to the question of whether Mr. Pignano's claim against Dr. Cash is time barred:

> **May 19, 2014:** Mr. Pignano has his initial visit with Dr. Cash after Mr. Pignano was "referred for evaluation of [a] right apical lung mass." A "patient visit note" contains Dr. Cash's assessment and provides for

3

"watchful waiting" and for another CT scan of Mr. Pignano's chest in August 2014 as follows:

> Pulmonary infiltrate; he has no constitutional symptoms to speak of. No productive cough is currently reported. He [has] not had weight loss or further adenopathy. At this point[,] the best approach will be watchful waiting with a repeat CT scan of his chest in August. This will be three months from his previous film. He has an insignificant and distant smoking history. If he has further problems[,] including hemoptysis, chest pain, dyspnea, weight loss, fever, night sweats, or adenopathy, he should give us an immediate call. If the CT scan shows [that] the problem has resolved[,] [then] he will not need further follow-up. If the problem gets worse[,] th[e]n we can decide appropriate measures, including biopsies.

**September 9, 2014:** Dr. Cash examines Mr. Pignano and postpones the CT scan, which was supposed to be completed in August per the notes from the first visit, with the following note: "Pulmonary infiltrate; as noted before he has no constitutional symptoms. This most likely means a benign process[,] but a CT scan in November will give us a full six months of follow-up. If he has problems, he's to give us a call immediately."

**November 11, 2014:** A second CT is performed on Mr. Pignano's chest. The CT scan reveals that the mass in Mr. Pignano's chest "is not significantly increased in size." Though Dr. Cash did not physically examine Mr. Pignano after the second scan, the scan results were sent to Dr. Cash. After review of the scan, Dr. Cash replied that Mr. Pignano is "stable at present[;] repeat CT 12 months unless he has symptoms."

4

**December 15, 2015:** Dr. Cash orders another CT scan of Mr. Pignano's chest.

**February 18, 2016:** A third CT scan of Mr. Pignano's chest reveals that the mass identified in the prior CT scans is slightly increased in size.

**February 22, 2016:** Dr. Cash sees Mr. Pignano. The "patient visit note" states that a needle biopsy should be performed:

> Lung mass; this mass has gotten slightly larger. We will need to arrange for a percutaneous needle biopsy wherever his insurance will allow. He does not need to be off work long. If the mass is benign[,] we will not do anything further. If the mass is cancerous[,] then we may try for either resection or radiation.

**April 14, 2016:** Dr. Cash orders a "Chest CT-Guided Needle Biopsy."

**April 26, 2016:** The results of the needle biopsy show that the mass is cancerous. Dr. Cash notifies Mr. Pignano that the mass should be removed.

**Summer 2016:** Mr. Pignano undergoes treatment, including surgical removal of the mass, chemotherapy, and radiation.

**September 6, 2016:** Counsel for Mr. Pignano provides notice to Dr. Cash in accordance with Section 74.051 et seq. of the Texas Civil Practice and Remedies Code. The notice states, "In particular, my client's complaint with you concerns your failure to timely and appropriately diagnose his lung cancer. The failure to provide Mr. Pignano with medical treatment [that] met the standard of care resulted in treatment[,] which has increased his medical expenses and lowered his life expectancy."

**April 9, 2018:** Mr. Pignano sues Dr. Cash for negligence. Mr. Pignano's original and amended petition in the section titled "Actions of Defendant" focused on the failure of Dr. Cash to initially diagnose that Mr. Pignano was suffering from cancer:

> Despite possessing and having within his knowledge and control evidence of [Mr. Pignano's] cancerous tumor, [Dr. Cash] collected blood samples from [Mr.] Pignano and had such samples inspected for a myriad of indications, such finding being indicative of serious, worsening, and possibly a lethal existing disease if left untreated. [Dr. Cash] failed to correctly interpret the CT Scan he reviewed and then ordered, and failed to communicate to [Mr.] Pignano the serious and worrisome findings highlighted by a radiologist, failed to refer [Mr.] Pignano to undergo a needle biopsy and further evaluation and treatment, and instead did nothing for over one year despite indications that [Mr.] Pignano was likely suffering from a pulmonary malignancy. If [Dr. Cash] had correctly recognized the significance of an apical pulmonary mass in a sixty-four[-]year[-]old man, informed him of the finding and the significance of such finding, acted upon and thereafter properly referred him for biopsy, further evaluation, and treatment for likely lung cancer, diagnosis, treatment, and therapy could have been instituted and initiated in months prior to April[] 2016. Instead, due to [Dr. Cash's] failure to recognize or appreciate the significance of the CT Scan finding, and his resulting failures to communicate to [Mr.] Pignano the need for immediate follow-up by biopsy, there was a delay of approximately sixteen months until [Mr.] Pignano followed-up with a biopsy. after which [Mr.] Pignano underwent surgery, followed by radiation and chemotherapy.[2]

---

[2]Mr. Pignano's petitions generally alleged the consequences of the disease process's continuing after Dr. Cash's failure to diagnose but did not allege these as departures from the standard of care:

Both petitions allege the following omissions by Dr. Cash:

> 1. In failing to correctly interpret multiple CT Scans of [Mr. Pignano's] chest;
>
> 2. In failing to recognize the significance of the continuing presence of an apical pulmonary mass;
>
> 3. In failing to immediately refer [Mr.] Pignano to undergo a biopsy; [and]
>
> 4. In failing to advise or inform [Mr.] Pignano of the continued presence of an apical pulmonary mass as reported to him.

**B.    The limitations ground of Dr. Cash's traditional motion for summary judgment, the evidence Dr. Cash offered to support that ground, and Mr. Pignano's counter evidence**

Dr. Cash filed both a traditional and a no-evidence motion for summary judgment. Dr. Cash moved for traditional summary judgment on the ground that Mr. Pignano's claim was time barred:

> Under the traditional summary[-]judgment standard, the evidence proves that the alleged negligence occurred—according to the Pignanos and their own expert—in November 2014. The Pignanos did not file suit until April 2018, well over three years after the alleged negligence. With a strict two-year limitations period governing their claims, the Pignanos'

However, if Defendant Dr. Cash had recommended and referred [Mr. Pignano] for the needle biopsy in December[] 2014, or at some time during the year 2015, or earlier in 2016, in reasonable medical probability and likelihood, the then[-]existing tumor would not have extended past its margins, nor would it have metastasized to lymph nodes; if the tumor had been so detected earlier, [Mr. Pignano] would have had a diagnosis of a much lesser stage of tumor, thereby greatly increasing his life expectancy, his survival outlook, and eliminating the medical necessity of the intensive, debilitating, and hazardous chemotherapy he had to undergo.

claims are barred by the statute of limitations. Dr. Cash is entitled to summary judgment because the statute of limitations expired before the Pignanos filed suit.

Mr. Pignano's retained expert that the quote references was Dr. Avi Markowitz, an oncologist. Excerpts from Dr. Markowitz's deposition are relied on by both parties.

Dr. Cash's summary-judgment excerpts from Dr. Markowitz's deposition—as did the allegations in Mr. Pignano's petitions—served to localize the date of Dr. Cash's departure from the standard of care to a particular instance by emphasizing Dr. Markowitz's opinion that Dr. Cash's departure from the standard of care occurred in November 2014. The framework of Dr. Markowitz's criticisms of Dr. Cash is set out in the following exchange with Dr. Cash's counsel:

> [Dr. Cash's counsel]: Dr. Markowitz, you think [a biopsy] definitely should have been done in March of 2014, but certainly no later than November of 2013 [(sic)]?
>
> [Dr. Markowitz]: Right. We would have done it in March, but giving a few months follow-up and then doing it at that point, I would not have gone after that. I would give him that much leeway.
>
> [Dr. Cash's counsel]: But the criticism is not of the 2016 care, the two times in 2014 where he didn't do the biopsy?
>
> [Dr. Markowitz]: Correct. Once he realized this was cancer[,] he went ahead and got the biopsy done. That's what you do. And we would have done it, like I said, a little differently, but that's [the] art of medicine. That I don't go after people for.

With respect to Dr. Markowitz's assessment of Dr. Cash's treatment before November 2014, Dr. Markowitz also stated that Dr. Cash's decision to delay the CT scan for three months was not one he liked, but he could live with it.

In later questioning, Dr. Markowitz amplified on why a departure from the standard of care occurred in November 2014 because Dr. Cash failed to do what was needed to obtain a diagnosis:

> [Dr. Cash's counsel]: Can I -- just based on what you just said and this answer and the previous answer. I want to make sure. So in the May of 2014 timeframe, while in [your] institution you would have biopsied and investigated it further, it was not necessarily negligent for Dr. Cash not to do something further. It is really in November when he didn't do something further that he [fell] below the standard of care.
>
> [Dr. Markowitz]: Correct.
>
> [Dr. Cash's counsel]: And then when [Dr. Cash] deals with [Mr. Pignano] again, he met the standard of care, so all we are really talking about is when he breached the standard of care was November of 2014.
>
> [Dr. Markowitz]: Yes. At that point I say, now it is not something you can monitor . . . anymore. Now you need to get a diagnosis.

In his summary-judgment response, Mr. Pignano cites other portions of Dr. Markowitz's deposition to rebut Dr. Cash's portrayal that the only departure from the standard of care occurred in November 2014. In essence, these opinions are that a proper diagnosis indicated that Mr. Pignano was already suffering from lung cancer in the May 2014 to November 2014 time period. But even in the excerpt quoted by

9

Mr. Pignano, Dr. Markowitz reiterated that he gave Dr. Cash leeway by noting that he "would have given him three months to do a follow-up."

The response then shifts to the 2016 time frame to argue that Dr. Markowitz opined that there were departures from the standard of care once Dr. Cash had the results of the third CT scan showing that the mass had grown and that a needle biopsy should be performed. The response quotes Dr. Markowitz's testimony and offers Mr. Pignano's interpretations of what conclusions should have been drawn from that testimony:

> Although Dr. Markowitz agreed that [Dr. Cash's] referral of [Mr. Pignano] for a biopsy was appropriate in the February 22, 2016 visit, he further testified that his treatment would have been different in that:
>
> > A.  It fits, although I will tell you we would do that differently. We would have gotten a PET/CT as the next step because one of the critical issues is are the hilar mediastinal lymph nodes involved[,] and if it lit up on CT, we would have recommended a bronchoscopy with biopsy to sample the nodes at that time rather than doing a percutaneous biopsy likely. But that is small. I mean, I would have done that differently[;] he did get a biopsy and that was appropriate.
> >
> > [Dr. Cash's counsel]:  When you said lights up on CT you meant what?
> >
> > [Dr. Markowitz's]:  Oh, it's a [lymphatic], excuse me. If the nodes light up on PET[,] that is much more significant because now you are probably looking at least a stage three disease.
>
> In other words, a PET/CT would have provided earlier indication of lymph node involvement, and hence, stage three disease.

Although the referral for a biopsy, finally, was appropriate, Dr. Markowitz further commented on the continuing violation of the standard of care after the third CT scan when he testified:

> A. Like I said, my biggest concern right here is what happened between February 22nd and April 26th, that is a two-month gap. We would do that[,] and I don't recall what the issue was for getting the biopsy, why it took two months.

Of particular importance to the events and timeline of this case[] is Dr. Markowitz's testimony regarding what injury or damage Mr. Pignano suffered during the two-month delay between the ordering of the biopsy and the results. He testified as follows:

> [Dr. Cash's counsel]: To follow back up on that, she phrased it as damage, what damage occurred, but what harm actually occurred to Mr. Pignano by the two-month delay?
>
> [Dr. Markowitz's]: You don't know. I mean, the likelihood that it changed and [that] suddenly he had metastasis, it is a low likelihood, but I have much more of a sense of urgency once you know, okay, this is going to be cancer, we need to find out exactly what kind it is and we need to complete a staging because if he is still candidate for curative intense surgery[,] we need to get there. [Record references omitted.]

After this portrayal of the departures from the standards of care by Dr. Cash, the response crystalizes its view of how Dr. Cash's errors harmed Mr. Pignano:

> Essentially, the question in this lawsuit is whether Dr. Cash's delay in making an appropriate diagnosis caused the cancer in Mr. Pignano's lung to metastasize into the lymph nodes so as to make necessary in addition to surgery, which would have been necessary in any case, the further treatments of chemotherapy and radiation, and due to a higher stage, cause him to suffer a higher chance of cancer recurrence and a lowered life expectancy.

11

The remainder of the response catalogs Dr. Markowitz's testimony regarding how the cancer mutated during the post-2014 delay in treatment and moved to a higher stage of severity. This pathology caused the cancer not to be localized but to spread into other regions of Mr. Pignano's body, such as his lymph nodes. The response concedes that Dr. Markowitz could not pinpoint when this occurred but could only opine that it was between November 2014 and February 2016.

With this mix of evidence before it, the trial court granted summary judgment and ordered that Mr. Pignano take nothing. Mr. Pignano appealed.

### III. Analysis

#### A. Standard of review

In a summary-judgment case, the issue on appeal is whether the movant met the summary-judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We review a summary judgment de novo. *Travelers Ins. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010).

With a traditional motion for summary judgment, "[a] court must grant a 'traditional' motion for summary judgment 'forthwith if [the summary-judgment evidence] show[s] that . . . there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law on the issues expressly set

out.'" *Draughon v. Johnson*, 631 S.W.3d 81, 87 (Tex. 2021) (citing Tex. R. Civ. P. 166a(c)).

We take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008); *Provident Life & Accident Ins. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). We also consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort*, 289 S.W.3d at 848. We must consider whether reasonable and fair-minded jurors could differ in their conclusions in light of all the evidence presented. *See Wal-Mart Stores, Inc. v. Spates*, 186 S.W.3d 566, 568 (Tex. 2006); *City of Keller v. Wilson*, 168 S.W.3d 802, 822–24 (Tex. 2005).

A defendant is entitled to summary judgment on an affirmative defense if the defendant conclusively proves all the elements of that defense. *Chau v. Riddle*, 254 S.W.3d 453, 455 (Tex. 2008); *see* Tex. R. Civ. P. 166a(b), (c). To accomplish this, the defendant must present summary-judgment evidence establishing each element of the affirmative defense as a matter of law. *Chau*, 254 S.W.3d at 455; *Ryland Grp., Inc. v. Hood*, 924 S.W.2d 120, 121 (Tex. 1996).

**B. The statutory provision establishing the statute of limitations on health care liability claims; the precedents interpreting the provision to hold that if there is an ascertainable date when the departures from a standard of care occurred, limitations run from that date; and the precedents applying the ascertainable-date principle to a failure to diagnose cancer**

Section 74.251 of the Texas Civil Practice and Remedies Code establishes the statute of limitations for health care liability claims as follows:

> Notwithstanding any other law and subject to Subsection (b), no health care liability claim may be commenced unless the action is filed within two years from the occurrence of the breach or tort or from the date the medical or health care treatment that is the subject of the claim or the hospitalization for which the claim is made is completed[.]

Tex. Civ. Prac. & Rem. Code Ann. § 74.251(a).[3] Though Section 74.251(a) provides three alternative dates for the commencement of the statute of limitations, the Texas Supreme Court has made the following principles clear:

- "A plaintiff may *not* choose the most favorable date that falls within [the] three categories." *Shah v. Moss*, 67 S.W.3d 836, 841 (Tex. 2001) (emphasis added).

---

[3]A "health care liability claim" is defined as

a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract.

Tex. Civ. Prac. & Rem. Code Ann. § 74.001(13).

14

- "[I]f the date the alleged tort occurred is ascertainable, limitations must begin on that date." *Id.*

- "And if the date is ascertainable, further inquiry into the second and third categories is unnecessary. *Id.*[4]

Section 74.251(a) contains no discovery rule: the statute of limitations begins to run from the dates of the events specified in the statute, irrespective of the claimant's delayed knowledge that a departure from the standard of care has occurred.[5] *See Walters*, 307 S.W.3d at 298 n.28.

---

[4]*Shah* analyzed a prior statute establishing the statute of limitations for health care liability claims. 67 S.W.3d at 841 (analyzing former Tex. Rev. Civ. Stat. Ann. art. 4590i, § 10.01). That statute provided the same alternatives for accrual that Section 74.251(a) provides, specifically that

> no health care liability claim may be commenced unless the action is filed within two years from the occurrence of the breach or tort or from the date the medical or health care treatment that is the subject of the claim or the hospitalization for which the claim is made is completed[.]

Act of April 19, 1977, 65th Leg., R.S., ch. 817, § 10.01, 1977 Tex. Gen. Laws 2039, 2052 (Medical Liability and Insurance Improvement Act of Texas, since amended), *repealed by* Act of May 16, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884.

[5]As the Texas Supreme Court explained,

> It is undeniable that the statute of limitations contains no discovery rule. We fashioned such a rule in a 1967 sponge case to suspend an earlier limitations provision. *Gaddis v. Smith*, 417 S.W.2d 577, 580 (Tex. 1967). The [l]egislature in 1975 abrogated the court-fashioned discovery rule. *See Sax v. Votteler*, 648 S.W.2d 661, 663 n.1 (Tex. 1983) (discussing the Professional Liability Insurance for Physicians, Podiatrists, and Hospitals Act of 1975, 64th Leg., R.S., ch. 330, § 1, 1975 Tex. Gen. Laws 864, 865,

The supreme court in *Shah* recognized that if a patient is subject to a course of treatment, there may not be an exact date of accrual, but that is the exception rather than the rule:

> However, there may be instances when the exact date the alleged tort occurred cannot be ascertained. The second category in [S]ection 10.01 contemplates such a situation "wherein the patient's injury occurs during a course of treatment for a particular condition and the only readily ascertainable date is the last day of treatment." *But before the last treatment date becomes relevant to determining when limitations begins, the plaintiff must establish a course of treatment for the alleged injury. Moreover, if the defendant committed the alleged tort on an ascertainable date, whether the plaintiff established a course of treatment is immaterial because limitations begins to run on the ascertainable date.*

67 S.W.3d at 841 (emphasis added) (citations omitted).

The Fourteenth Court of Appeals applied the principles from *Shah* to facts analogous to the ones before us. *See Estate of Klovenski v. Kapoor*, No. 14-13-00850-CV, 2015 WL 732651, at *5 (Tex. App.—Houston [14th Dist.] Feb. 19, 2015, no pet.) (mem. op. on reh'g). *Kapoor* involved a patient who had five office visits with a physician. *Id.* at *4. During the first four visits, the physician failed to diagnose a

which removed the "accrual" language that had led the Court to find a discovery rule embedded within the statute). Accordingly, in a 1985 case, this Court acknowledged that the [*l*]egislature had abrogated the discovery rule. *Morrison v. Chan*, 699 S.W.2d 205, 208 [(Tex. 1985)] ("[In *Gaddis*, we] held that a cause of action does not accrue until the plaintiff knows, or has reason to know, of his injury. In contrast, [A]rticle 5.82, [S]ection 4 contains no accrual language and thus imposes an absolute two-year statute of limitations regardless of when the injury was discovered." . . . (emphasis omitted) (quoting *Nelson v. Krusen*, 678 S.W.2d 918, 920 (Tex. 1984))[)].

*Walters v. Cleveland Reg'l Med. Ctr.*, 307 S.W.3d 292, 298 n.28 (Tex. 2010).

16

lump in the patient's leg as cancerous. *Id.* On the fifth visit, the physician properly diagnosed the lump as cancerous. *Id.* The date of the last visit was pivotal to the viability of the patient's claim because the claim was time barred if limitations was not measured from the date of the fifth visit. *Id.*

*Kapoor* held that the breach of the standard of care by the physician was ascertainable, and thus, limitations was measured from the date of the last occurrence of a departure from the standard of care. *Id.* at *5–6. The court summarized its conclusion and cataloged the cases supporting that conclusion as follows:

> We determine that the dates of [the physician's] alleged breaches are ascertainable; therefore, we measure limitations from the occurrences of the alleged breaches. *See Shah*, 67 S.W.3d at 841. The failure to diagnose or treat a medical condition does not establish a course of treatment. *See Bala v. Maxwell*, 909 S.W.2d 889, 892 (Tex. 1995); *Rowntree v. Hunsucker*, 833 S.W.2d 103, 105–06 (Tex. 1992) . . . ("While the failure to treat a condition may well be negligent, we cannot accept the self-contradictory proposition that the failure to establish a course of treatment is a course of treatment."). [The physician's] alleged negligence for failure to diagnose, treat, and advise [the patient] of her cancer could have occurred only on the days [the physician] examined [the patient]; those days are readily ascertainable. *See Shah*, 67 S.W.3d at 844 (doctor's failure to provide follow-up treatment could have occurred only on check-up visits when doctor had an opportunity to order follow-up treatment); *Husain v. Khatib*, 964 S.W.2d 918, 919–20 (Tex. 1998) (doctor's failure to take action to diagnose and treat cancer could have occurred only during office visits); *Bala*, 909 S.W.2d at 892 (same).

*Id.* at *5.

With its premise in place—that the dates of the acts of malpractice were ascertainable—*Kapoor* held that limitations began to run on each visit at which the physician failed to properly diagnose the lump as cancerous. *Id.* Because limitations

17

could not be measured from the date when the physician properly diagnosed the presence of cancer, the patient could not use the date of her fifth visit as an occurrence triggering the commencement of limitations to save her claims from being barred by limitations. *Id.* Specifically, the court held, "Therefore, [the physician] was not negligent under appellants' alleged standard of care for failure to diagnose, treat, and advise [the patient] of her cancer on [the date of the fifth visit]. We do not measure limitations from this date." *Id.*

Our court has also discussed how the failure to diagnose cancer is a tort that occurs on an ascertainable date—the date that the failure to diagnose occurred—and does not involve a course of treatment that extends limitations until the cancer is properly diagnosed. *See Gilbert v. Bartel*, 144 S.W.3d 136, 143 (Tex. App.—Fort Worth 2004, pet. denied). We detailed why a failure to diagnose does not create a course of treatment as follows:

> Because, as we hold above, the date the alleged tort or breach took place is ascertainable, a course[-]of[-]treatment analysis is immaterial to determining when limitations began to run. It is also unimportant to our inquiry whether the tort is characterized as a failure to diagnose cancer or as an improper course of treatment based on a misdiagnosis. The [appellants'] complaint is that [the physician] was negligent in not taking actions—testing, referrals to specialists, proper examinations—that would have led to earlier discovery of [the patient's] cancer. Those events, or nonevents, occurred on specific ascertainable dates. The Texas Supreme Court has held that when a physician fails to diagnose a condition, the continuing nature of the diagnosis does not extend the tort for limitations purposes. "'While the failure to treat a condition may well be negligent, we cannot accept the self-contradictory proposition that the failure to establish a course of treatment is a course of treatment.'" Furthermore, neither the mere continuing relation between

physician and patient nor the continuing nature of a diagnosis is sufficient to create a course of treatment.

*Id.* (footnotes omitted).

Thus, a failure to diagnose cancer is episodic for the purpose of limitations: the visit at which the failure to diagnose occurs is the ascertainable date when the departure from the standard of care occurs. The fact that later examinations produce a proper diagnosis does not create a course of treatment that triggers the commencement of limitations at the cancer's eventual discovery.[6]

**C.** **Why we conclude that Dr. Cash's alleged departures from the standard of care occurred on an ascertainable date and that the application of that date establishes that Mr. Pignano's claim is barred by limitations**

The question before us is how many discrete, ascertainable departures from the standard of care occurred. Whether there was a datable ascertainable breach or departure impacts Mr. Pignano's argument in his second issue that limitations was triggered only at the end of his course of treatment. Should we reject his course-of-treatment argument, Mr. Pignano's fallback in his third issue is that Dr. Markowitz opined that there was a breach of the standard of care that occurred in 2016 and that measuring limitations from that date makes his claim timely. We reject both arguments.

---

[6]Because Mr. Pignano gave notice of his claim, the statute of limitations was tolled for seventy-five days. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.051(c). Because we hold that the ascertainable date that limitations commenced was in November 2014, the seventy-five-day tolling provision has no effect on the outcome of this appeal.

19

There is no question that Dr. Markowitz opined that Dr. Cash had failed to properly diagnose and treat Mr. Pignano in November 2014. But Mr. Pignano tries to shift the analysis from an ascertainable date to a course of treatment by arguing that Dr. Cash's description of his approach as "watchful waiting" establishes that there was a course of treatment that flows into the eventual diagnosis of his cancer and not a specific episode of malpractice. But semantics does not alter the reality that the term watchful waiting means that Dr. Cash decided to wait from an ascertainable date to take the action that Dr. Markowitz opines that he should have taken—biopsying the mass to obtain what Dr. Markowitz said was required (i.e., the "need to get a diagnosis"). The case law is clear that when such an ascertainable date exists, a plaintiff cannot rely on the theory that there was a course of treatment.

Mr. Pignano also emphasizes that his disease was apparently metastasizing and becoming more severe in the time period between the 2014 failure to diagnose and Dr. Cash's ordering a needle biopsy in February 2016. This argument cannot wire around the supreme court's statement that "if the defendant committed the alleged tort on an ascertainable date, whether the plaintiff established a course of treatment is immaterial because limitations begins to run on the ascertainable date." *See Shah*, 67 S.W.3d at 841. The argument also cannot evade the principle that "[w]hile the failure to treat a condition may well be negligent, we cannot accept the self-contradictory proposition that the failure to establish a course of treatment is a course of treatment." *Rowntree*, 833 S.W.2d at 105–06. It is also contrary to the holdings of the

Fourteenth Court of Appeals and of our court that we have detailed above. *See Kapoor*, 2015 WL 732651, at *5 ("We determine that the dates of [the physician's] alleged breaches are ascertainable; therefore, we measure limitations from the occurrences of the alleged breaches."); *Gilbert*, 144 S.W.3d at 143 ("The [appellants'] complaint is that [the physician] was negligent in not taking actions—testing, referrals to specialists, proper examinations—that would have led to earlier discovery of [the patient's] cancer. Those events, or nonevents, occurred on specific ascertainable dates."). Simply, the failure to diagnose the illness on an ascertainable date permitted the disease process to continue; that is not the result of a course of treatment but rather the result of the datable act of the failure to diagnose.

Thus, to save his suit from the bar of limitations by expanding on the allegations in his petitions, Mr. Pignano turns to his third issue that Dr. Markowitz testified that a later ascertainable departure occurred—one that would make his suit timely. To support this theory, he argues that Dr. Markowitz opined that Dr. Cash departed from the standard of care in 2016 by his delays in ordering a needle biopsy of the mass once Dr. Cash determined that the procedure should be performed. We have quoted Mr. Pignano's summary-judgment response at length to show the basis for this argument. The testimony referenced by Mr. Pignano does not support his argument.

Again, Dr. Cash's counsel set the parameters of Dr. Markowitz's opinions by having him agree that his criticisms did not relate to what had occurred in 2016:

21

[Dr. Cash's counsel]:  But the criticism is not of the 2016 care, the two times in 2014 where he didn't do the biopsy?

[Dr. Markowitz]:  Correct.  Once he realized this was cancer[,] he went ahead and got the biopsy done.  That's what you do.  And we would have done it, like I said, a little differently, but that's [the] art of medicine.  That I don't go after people for.

Indeed, Dr. Markowitz conceded that he did not "have any issues or criticisms of Dr. Cash specifically at the February 22nd 2016 visit as far as his care and treatment go."  He also conceded that his opinion was "that what [Dr. Cash] did in February 2016 was appropriate . . . [but] definitely should have been done sooner."

The one snippet of testimony that Mr. Pignano offers to argue that Dr. Markowitz opined that Dr. Cash's February treatment was substandard fails to carry the day.  Mr. Pignano notes that Dr. Markowitz might have ordered additional testing.  But in the next breath Dr. Markowitz stated, "But that is small.  I mean, I would have done that differently[;] he did get a biopsy[,] and that was appropriate."[7]

---

[7]In his opening brief and in his reply brief, Mr. Pignano argues that Dr. Markowitz testified that "Dr. Cash's care in its entirety was below the standard of care."  We do not read the testimony cited in support of this statement to bear it out:

Q.  Okay.  So as we sit here today, as of now, it is not your opinion that Dr Cash's care in its entirety was below the standard of care, correct?

A.  I don't think I can answer that question other than to say I believe without question that it was below the standard of care and the evaluation of a likely lung cancer.

And to the extent that his testimony could be read to criticize the entirety of Dr. Cash's care, the other testimony of Dr. Markowitz that we cited demonstrates that he tied his opinions about the failure to meet the standard of care to particular events.

Pivotally, Dr. Markowitz's deposition testimony does not contain an opinion that Dr. Cash breached the standard of care because of the gap in time between Dr. Cash's ordering the needle biopsy in February 2016 and the time it was conducted in April 2016. Though Dr. Markowitz testified that this was his "biggest" concern, he could not attribute the gap to anyone's action or inaction and did not opine that it was a violation of the standard of care. Dr. Markowitz's deposition testimony was as follows: "Like I said, my biggest concern right here is what happened between February 22nd and April 26th, that is a two-month gap. We would do that[,] and I don't recall what the issue was for getting the biopsy, why it took two months."

Nor does the additional testimony that Mr. Pignano cites on the issue of the two-month delay reference a departure from the standard of care:

> [Dr. Cash's counsel]: To follow back up on that, she phrased it as damage, what damage occurred, but what harm actually occurred to Mr. Pignano by the two-month delay?
>
> [Dr. Markowitz]: You don't know. I mean, the likelihood that it changed and . . . suddenly he had metastasis, it is a low likelihood, but I have much more of a sense of urgency once you know, okay, this is going to be cancer, we need to find out exactly what kind it is [,]and we need to complete a staging because if he is still candidate for curative intense surgery[,] we need to get there.

Also, the next question and answer—not referenced by Mr. Pignano—reinforces that Dr. Markowitz is not claiming that the delay is a breach of the standard of care or something that harmed Mr. Pignano:

> [Dr. Cash's counsel]: [W]hat I heard you say[—]and I don't want to put words in your mouth[—]is that you are not aware of any harm befalling

23

the patient because of that two months, you'd certainly like to see things, but you can't say he had no involvement because of the two-month delay or metastasis because of the two-month delay?

[Dr. Markowitz]: You are correct. Yes, I am not inferring that everything was cool[,] and then two months later[,] it went to hell. That is not a fair statement.

This testimony does not reference a standard of care. Even if viewed as a criticism of Dr. Cash, we do not know if Dr. Markowitz is offering anything other than his personal opinion on the issue. Even if we could discern an opinion that a departure from the standard of care occurred, Dr. Markowitz's deposition testimony—that the likelihood is low that the cancer suddenly metastasized in the two-month period—disables any argument that there is a reasonable medical probability that this breach caused harm to Mr. Pignano. *See Jelinek v. Casas*, 328 S.W.3d 526, 532–33 (Tex. 2010) (stating that in order to meet the legal-sufficiency standard in medical malpractice cases, "plaintiffs are required to adduce evidence of a 'reasonable medical probability' or 'reasonable probability' that their injuries were caused by the negligence of one or more defendants, meaning simply that it is 'more likely than not' that the ultimate harm or condition resulted from such negligence"). This is simply not sufficient to constitute a scintilla of evidence raising a fact issue that Dr. Cash departed from the standard of care in 2016 or that the departure caused injury to Mr. Pignano, even if he had predicated his suit on that claim.[8]

---

[8]Mr. Pignano pleaded that the open-courts provision of the Texas Constitution saved his claim from being barred by limitations. Dr. Cash moved for a traditional

24

We have considered all the summary-judgment evidence by analyzing all the excerpts of Dr. Markowitz's deposition that were offered and the medical records of Mr. Pignano's care. The summary-judgment record establishes two things. The date of the breach of or departure from the standard in this case is ascertainable. According to Dr. Markowitz, it occurred in November 2014 when Dr. Cash departed from the standard of care by not ordering a needle biopsy after the second CT scan showed that the mass was still present. Thus, Mr. Pignano cannot rely on a course of treatment to save his claim from the bar of limitations. Nor can Mr. Pignano rely on

---

summary judgment and a no-evidence summary judgment on this issue. The First Court of Appeals recently outlined the open-courts provision and how it may prevent the operation of the statute of limitations from barring a health care liability claim as follows:

> The Texas Constitution guarantees that persons bringing common-law claims will not unreasonably or arbitrarily be denied access to the courts. Tex. Const. art. I, § 13 ("All courts shall be open, and every person for an injury done him, in his lands, goods, person[,] or reputation, shall have remedy by due course of law."); *see also Thomas*[ *v. Jayakumar*, No. 01-14-00984-CV], 2016 WL 640629, at *3[ (Tex. App.—Houston [1st Dist.] Feb. 11, 2016, no pet.) (mem. op.)]. The open[-]courts provision, however, does not toll limitations. *See Tenet Hosps. Ltd. v. Rivera*, 445 S.W.3d 698, 703 (Tex. 2014). Rather, unlike a tolling provision, which defers the accrual of a cause of action until the plaintiff knew or, exercising reasonable diligence, should have known of the facts giving rise to her claim, the open[-]courts provision merely gives a litigant a reasonable time to discover her injuries and file suit. *Rivera*, 445 S.W.3d at 703, *Walters*, 307 S.W.3d at 295.

*Harris v. Kareh*, No. 01-18-00775-CV, 2020 WL 4516878, at *6 (Tex. App.—Houston [1st Dist.] Aug. 6, 2020, pet. denied) (mem. op.). Mr. Pignano's brief does not present any issue or argument that the open-courts provision saves his claim. Thus, we will not address that provision's impact on Mr. Pignano's claim.

Dr. Markowitz's deposition to establish that he opined that there were departures from the standard of care in 2016; the deposition cannot be read to support Mr. Pignano's argument that Dr. Markowitz opined that there was a later breach because of the 2016 delay in conducting a third CT scan.[9]

---

[9]Mr. Pignano also attached Dr. Markowitz's expert report to his summary-judgment response. "[A]n expert report [required to be filed as part of a health care liability claim]: (1) is not admissible in evidence by any party; (2) shall not be used in a deposition, trial, or other proceeding; and (3) shall not be referred to by any party during the course of the action for any purpose." Tex. Civ. Prac. & Rem. Code Ann. § 74.351(k). We have held that it is improper to use an expert report as summary-judgment evidence but that the use of the report is a defect of form to which an objection must be made. *See Coleman v. Woolf*, 129 S.W.3d 744, 747–50 (Tex. App.—Fort Worth 2004, no pet.). Here, Dr. Cash objected to the use of the report as incompetent summary-judgment evidence, the trial court overruled the objection, and Dr. Cash does not challenge that ruling on appeal. But whether the report may be considered as summary-judgment evidence, we agree with Dr. Cash that Dr. Markowitz clarified his opinions during his deposition, and we rely on his deposition testimony as the statement of what departures from the standard of care occurred.

## IV. Conclusion

We overrule Mr. Pignano's first issue that generally attacks the trial court's grant of summary judgment. We also overrule Mr. Pignano's more specific second and third issues claiming that a course of treatment by Dr. Cash made Mr. Pignano's suit timely and that Dr. Markowitz dated the ascertainable departure from the standard of care in 2016 such that it made the suit timely. We affirm the summary judgment that Mr. Pignano take nothing from Dr. Cash.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: January 6, 2022